UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DEBORAH TURK, | ) | CASE NO. 3:14CV539 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | REPORT AND RECOMMENDATION |
| ACTING COMMISSIONER OF | ) | OF MAGISTRATE JUDGE |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Deborah Turk ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

## I.    PROCEDURAL AND FACTUAL HISTORY

Plaintiff applied for DIB and SSI on April 8, 2011, alleging disability beginning March 31, 2005 due to ruptured discs, osteoarthritis, severe hypertension and anxiety.   Transcript of proceedings ("Tr.") at 134-135, 154.   The SSA denied Plaintiff's applications initially and on reconsideration.  *Id.* at 32-66.  Plaintiff requested an administrative hearing and on January 22, 2013, the Administrative Law Judge ("ALJ") conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 76, 908-930. On March 14, 2013, the ALJ issued a Decision finding that Plaintiff was not disabled prior to June 23, 2012 but became disabled on that date and continued to be disabled through the date of her decision.  *Id.* at 16-31.  Thus, the ALJ found that Plaintiff was not entitled to DIB through

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

September 28, 2008, her date last insured, but she was entitled to SSI beginning on June 23, 2012. *Id.* at 31.

Plaintiff requested that the Appeals Council review the unfavorable portion of the ALJ's Decision, and on January 23, 2014, the Appeals Council denied review. Tr. at 7-11.

On March 11, 2014, Plaintiff filed the instant suit seeking review of the ALJ's Decision. ECF Dkt. #1. On October 5, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #16. On December 11, 2014, Defendant filed a brief on the merits, and on January 8, 2015, Plaintiff filed a reply brief. ECF Dkt. #s 19, 21.

## II.  SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that since the alleged onset date of disability of March 31, 2005, Plaintiff suffers from multilevel thoracic and lumbar spine degenerative disc disease ("DDD"), mild sacroiliac joint degenerative joint disease ("DJD"), early spondylosis at L4-L5 with nerve root effect, hypertension, depression, anxiety, obesity and migraines. Tr. at 18. She further determined that beginning on the established onset date of disability of June 23, 2012 for SSI purposes, Plaintiff suffered from the above impairments and the additional impairment of a left occluded internal carotid artery with cerebral infarct. *Id.* at 18-19. The ALJ found that all of these impairments were severe impairments under 20 C.F.R. §404.1520(c) and 20 C.F.R., § 416.920(c). *Id.* The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 419.920(d), 416.925, 416.926 ("Listings"). Tr. at 20.

The ALJ found that prior to June 23, 2012, Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, as defined by 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that: the work could be done in a seated or standing position; she could only occasionally climb stairs; she could not climb ladders and the like; she could only occasionally stoop, kneel and crouch; she could rarely crawl; she could only have occasional exposure to temperature extremes and respiratory irritants; she could have no exposure to obvious hazards; and she could perform work with the specific vocational preparation ("SVP") of 1 to 2, where the pace of productivity was not

-2-

dictated by an external source over which Plaintiff had no control, such as an assembly line or conveyor belt.  Tr. at 22.

The ALJ further found that beginning on June 23, 2012, there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform as the ALJ accepted the VE's testimony that off-task behavior in excess of 20% of the day would preclude competitive employment.  Tr. at 31.  She further noted that Plaintiff subsequently changed age categories to closely approaching advanced age and as such, even if she had the RFC for a full range of sedentary work, a finding of disabled was required by Medical-Vocational Rule 201.14.  *Id.*

Accordingly, the ALJ concluded that as of March 31, 2005 through June 22, 2012, Plaintiff was unable to perform her past relevant work as a licensed practical nurse or a nurse's aide, but she was capable of performing jobs existing in significant numbers in the national economy, such as a bench worker, an assembler, or an order clerk.  Tr. at 29-30.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to DIB benefits through September 28, 2008, her date last insured.  *Id.*  However, the ALJ found that as of June 23, 2012, Plaintiff was unable to perform her past relevant work and no jobs existed in significant numbers in the national economy that she could perform and she was entitled to SSI from June 23, 2012 through the date of the ALJ's decision.  *Id.* at 31.

### III.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ

may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.**     **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

    Plaintiff advances two arguments in this appeal: she contends that the ALJ erred when he did not give controlling weight to the opinions of her treating physician Dr. Bryan. Plaintiff also argues that the ALJ erred by failing to award her at least a closed period of disability that began prior to her date last insured. ECF Dkt. #16.

    **A.**     **Medical history**

    As pointed out by Defendant, Plaintiff's brief challenges only the findings regarding her physical condition. Accordingly, the undersigned's presentation of the medical evidence will address only Plaintiff's physical conditions. In addition, the undersigned will address only the evidence from March 31, 2005, Plaintiff's alleged onset date, through June 23, 2012, the date on which the ALJ determined that Plaintiff's period of disability began.

    Plaintiff began treating with Dr. Bojrab, M.D. of Pain Management Associates on June 7, 2004 for her thoracic back pain. Tr. at 331. She told Dr. Bojrab that her pain began in February of 2004 and she described the pain as crushing pain that worsened with standing and walking and improved by lying down. *Id.* He noted that Plaintiff had tried a TENS unit and multiple medications with no success. *Id.* He indicated that Plaintiff had sleeplessness, nausea and vomiting, no chest pain or palpitations, some kidney problems, back pain but no neck pain, no depression or anxiety, and no fatigue. *Id.* Upon examination, Plaintiff's blood pressure reading was 189/113, and her weight was 254 pounds with a height of 5 feet, 5 inches. *Id.* at 332. He noted that Plaintiff was in mild distress, with no abdomen tenderness, clear lung sounds, good range of neck motion, no motor or sensory deficit, but pain on palpation of the thoracic and lumbar spine. *Id.* He assessed thoracic spine DDD and a history of thoracic vertebral body fracture and he recommended epidural steroid injections. *Id.*

    On March 31, 2005, Dr. Presti of Fort Wayne Cardiology wrote a letter to Dr. Wiley, Plaintiff's treating doctor, indicating that he examined Plaintiff concerning the inability to control her blood pressure. Tr. at 304. He noted that he had last examined Plaintiff in 2003 for

-5-

hypertension and atypical chest pain that resulted in negative stress tests. *Id.* He noted Plaintiff's current blood pressure fluctuations and problems with hematuria for which a cystoscopy was performed and from which she was told that blood in her urine was coming from her kidneys. *Id.* However, she reported that CT scans were normal and she was passing blood clots earlier in the year and they had resolved. *Id.* He noted that Plaintiff's cardiac risk factors included her smoking of a pack of cigarettes a day and her weight, although she had lost twenty pounds over the past few months. *Id.*

Upon examination, Dr. Presti found that Plaintiff's blood pressure was 130/96 and her weight was 273 pounds. Tr. at 305. There were no abnormalities in her neck, chest, heart, extremities or abdomen. *Id.* His impressions were hypertension with probable hypertensive cardiovascular disease, long-standing and ongoing tobacco abuse, hyperlipidemia, and obesity. *Id.* His recommendations included restarting Verelan at a lower dose, avoiding the use of Clonidine and having an echocardiogram to reevaluate left ventricular function. *Id.* at 305. The echocardiogram showed no abnormalities. *Id.* at 303.

On April 27, 2005, Plaintiff presented to Community Memorial Hospital complaining of a migraine that started that afternoon. Tr. at 577. She was diagnosed with migraine headache and hypertension. *Id.* at 580.

On May 5, 2005, Dr. Presti wrote a letter to Dr. Wiley indicating that he followed up with Plaintiff and had been seeing Plaintiff for her hypertension in addition to two other doctors. Tr. at 301-302. He advised that a MRI of Plaintiff's kidneys showed no nephritis, CT scans showed no adrenal tumors, and an echocardiogram showed no abnormalities. *Id.* at 301-303. He further noted that Plaintiff continued to have fluctuating blood pressure readings and he advised her that it was not in Plaintiff's best interest to have three different doctors trying to manage her blood pressure, so he advised her to follow-up with Drs. Munir and Wiley unless specific cardiac issues arose. *Id.* at 302. Dr. Presti further advised Plaintiff to lose weight and stop smoking. *Id.* He listed Plaintiff's medications as Verelan, Synthroid, Lexapro, Lasix, Atacand, Catapres patch #2, Nexium and Potassium. *Id.* at 301.

-6-

On May 21, 2005, Plaintiff presented to the emergency room complaining of headache and elevated blood pressure. Tr. at 357. She was treated and diagnosed with hypertension, headache, tobacco abuse and morbid obesity. *Id.* at 360. She was advised to stop smoking, lose weight and follow up with her doctor. *Id.*

A June 25, 2005 MRA of the brain showed no evidence of aneurysm and August 19, 2005 and September 16, 2005 CT scans of the head showed no evidence of brain abnormality. Tr. at 529-531. Plaintiff presented to the hospital on June 26, 2005 complaining of a headache that started the night prior that varied with her blood pressure. *Id.* at 571. She indicated that she had the brain MRI the day prior. *Id.* at 574. She was diagnosed with migraine and hypertension and discharged in an improved state. *Id.* at 576.

On July 8, 2005, Plaintiff underwent a sleep study which showed that she had nearly constant snoring plus six obstructive apneas, one mixed apnea, two central apneas and ten partial apneas that were primarily obstructive. Tr. at 510. Based upon the results, Dr. Sullivan opined that Plaintiff had difficulty initiating and maintaining sleep due to spontaneous arousals and periods of wakefulness. *Id.* He noted that Plaintiff had a low baseline oxygen saturation and this desaturation, with Plaintiff's significant obesity, led him to suspect obesity-hyperventilation syndrome and/or chronic respiratory insufficiency. *Id.* at 511. Dr. Sullivan recommended checking Plaintiff's pulmonary function tests to look for evidence of restriction related to her obesity and to exclude cardiopulmonary disease. *Id.* He also indicated that Plaintiff may be a candidate for nocturnal oxygen or BiPAP and he suggested placing her on two liters of oxygen per minute during sleep. *Id.*

On August 30, 2005, Plaintiff presented to Dr. Hall for treatment of her hypertension. Tr. at 277. Dr. Hall noted that Plaintiff smoked one to one-and-a-half packs of cigarettes per day for the last ten years and although she had a five or six-year history of hypertension, it was becoming more difficult to control over the last year. *Id.* at 278. Plaintiff reported to Dr. Hall that she had severe episodes of pounding in her head and severe back pain which corresponded to a high blood pressure reading when her blood pressure was taken during that time. *Id.* at 278-279. She indicated that she had at times gone to the emergency room or the hospital during such times for additional treatment. *Id.* at 279. Dr. Hall's impressions were obesity, hypertension not ideally controlled, and

-7-

history of hematuria, although the urine screen on August 30, 2005 was negative for blood or protein. *Id.* at 278. He ordered blood tests and the monitoring of Plaintiff's blood pressure and recommended that Plaintiff lose weight, stop smoking and exercise. *Id.* He noted Plaintiff's medications as Catapres-TTS, Atacand, Synthroid, Lipitor, Lexapro, Zofran, Percocet, Ambien, and Oxygen of 2 liters at night. *Id.* at 279-280. He prescribed Hydrochlorothiazide and advised her to stop taking oral Catapres-TTS and Verelan. *Id.* at 280.

An October 5, 2005 x-ray of the cervical spine showed mild degenerative disc changes at C5-C6 and C6-C7 with slight disc space narrowing and small endplate osteophytes and ossification of the anterior longitudinal ligament at C5-C6. Tr. at 527.

On October 17, 2005, Plaintiff presented to Community Memorial Hospital complaining of nausea and flank pain on the left side. Tr. at 569. She was diagnosed with nausea and dysuria. *Id.* at 569-571.

On November 15, 2005, Plaintiff presented to Dr. Bojrab for complaints of left-sided flank pain and arm pain. Tr. at 329. He noted that she was taking Percocet for pain relief and he noted her history of DDD. *Id.* Dr. Bojrab found her physical examination unchanged and a review of her cardiovascular, pulmonary, genitourinary, gastrointestinal and neurologic systems was normal, with back and flank pain noted as positive for her orthopedic system. *Id.* He assessed thoracic radiculitis and back pain and began her on MS Contin. *Id.* He referred her back to the Cleveland Clinic for evaluation and suggested a multi-system review because she should not be having thoracic fractures at her age. *Id.* On December 13, 2005, Plaintiff followed up with Dr. Bojrab and reported her thoracic back pain as a 2 on a 10-point scale, indicating that she was very pleased with the relief that she was getting from MS Contin. *Id.* at 328. Dr. Bojrab found that Plaintiff's back pain was improved upon examination and he instructed her to return in six weeks and to continue a medical workup at the Cleveland Clinic. *Id.* On February 2, 2006, Plaintiff presented to Dr. Bojrab and reported that she had no back pain, but she was having headaches for which she was treating with her family doctor. *Id.* at 327. Dr. Bojrab found Plaintiff's pain improved upon examination and he assessed low back pain and headache and instructed Plaintiff to return in six months. *Id.*

-8-

On February 28, 2006, the Holter Monitoring Report indicated that Plaintiff had normal 24-hour ECG recording and sinus rhythm, an intermittent sinus tachycardia, and a simple ventricular arrhythmia of isolated premature ventricular complexes. Tr. at 286. The report indicated that Plaintiff's documented symptoms did not correlate with any significant cardiac arrhythmias. *Id.*

On March 27, 2006, Plaintiff presented for an MRI of the thoracic, lumbar and sacrolumbar spine which showed the following: multilevel degenerative disc changes in the thoracic spine with disc space narrowing, sclerosis and endplate osteophyte formation and mild leftward curvature in the mid-thoracic spine which may be positional or muscle-spasm related; multilevel mild degenerative disc changes in the lumbar spine with aortoilliac calcifications, unusual for a patient of this age; and mild sacroiliac degenerative changes and mild dorsal displacement of distal coccygeal segments by only a few millimeters likely related to remote trauma. Tr. at 334.

On March 28, 2006, Plaintiff presented to Dr. Bojrab complaining of low back pain rated as a 7 on a 10-point scale. Tr. at 326. Upon physical examination, he noted that Plaintiff was in no acute distress, her vital signs were stable, and Plaintiff had positive pain on palpation of the sacroiliac joint. *Id.* He assessed sacroilitis and recommended a sacroiliac joint injection. *Id.* On April 12, 2006 and May 3, 2006, Plaintiff underwent sacroiliac injections. *Id.* at 323-325.

On June 13, 2006, Plaintiff presented to Dr. Bojrab complaining of low back pain and pain radiating into her right leg which she rated as 5/10. Tr. at 322. She also complained of left thoracic spine pain. *Id.* She was still taking MS Contin for her pain. *Id.* Physical examination was normal, but positive for pain on palpation of the thoracolumbar spine. *Id.* Dr. Bojrab assessed thoracic/lumbar spine DDD and low back pain and ordered a MRI of the lumbar spine. *Id.* The lumbar MRI showed early spondylosis, most prominent at L4-L5 with some mild left disc bulging that abuts the left L4 nerve roots and no findings accounting for her right side pain. *Id.* at 333.On July 14, 2006, Dr. Bojrab reviewed Plaintiff's MRI and assessed lumbar facet arthropathy, low back pain and lumbar spine DDD and he noted positive pain on palpation of the lumbar facets. *Id.* at 321. He recommended lumbar facet injection. *Id.* On September 6, 2006, Plaintiff underwent a lumbar epidural steroid injection with fluoroscopy on Plaintiff for her diagnoses of low back pain and lumbar spine DDD. *Id.* at 319.

On September 19, 2006, Plaintiff presented again to Dr. Bojrab for her low back pain, which she rated as 2/10. Tr. at 318. He noted that Plaintiff was very pleased with her progress and she complained mainly of muscle soreness. *Id*. Physical examination showed no abnormalities, except positive pain on palpation of the lumbosacral spine. *Id*. Dr. Bojrab assessed low back pain and recommended physical therapy three times a week for one month and then a return to the clinic. *Id*.

On December 26, 2006, Plaintiff underwent a CT of her abdomen for her hypertension with flushing. Tr. at 423. The CT of the aorta and renal arteries showed no evidence of aneurysm but the aorta was diffusely atherosclerotic with plaque extending in the common iliac arteries. *Id*. A 50% stenosis was seen at the origin of the artery supplying the inferior pole of the left kidney. *Id*.

On March 23, 2007, Plaintiff underwent a brain MRI that showed no abnormalities. Tr. at 471. A June 21, 2007 chest x-ray showed no abnormalities. *Id*. at 524. May 3, 2007 emergency room records showed that Plaintiff presented with a productive cough and nausea. *Id*. at 550. She was diagnosed with asthma exacerbation and bronchitis. *Id*. at 551-552. A November 1, 2007 chest CT scan showed a 7 mm left lower lobe pulmonary nodule. *Id*. at 481. A November 2, 2007 PET scan showed a non-avid left basilar lung nodule with a recommendation for a six-month follow up to assure stability as it was opined that it may represent a non-calcified granuloma, and the scan also showed atherosclerotic vascular disease, fatty infiltration of the liver with mild hepatomegaly, and colon diverticulosis with no evidence of diverticulitis. *Id*. at 482.

On October 1, 2008, Plaintiff presented to the emergency room for complaints of a headaches over the past week with occasional dizziness and nausea. Tr. at 419. Plaintiff had been at the office of her primary care physician Dr. Bryan and told him that she was having the worst headache of her life so she sent her to the emergency room for evaluation. *Id*. Plaintiff's blood pressure was 150/113and a head CT scan was negative. *Id*. at 419-420. She was diagnosed with acute cephalgia and improved upon treatment with Benadryl, Phenergan, Ativan and Dilaudid. *Id*. at 420. The attending physician attached an addendum indicating that a lumbar puncture was indicated, but Plaintiff was adamant that she did not want the lumbar puncture, so it was not performed. *Id*. at 417.

On December 3, 2008, Plaintiff had a chest and abdomen scan which showed status post cholecystectomy and a right middle lobe infiltrate. Tr. at 475.

-10-

On December 20, 2008, Plaintiff underwent an abdomen and pelvic CT which showed status post cholecystectomy, diffuse fatty infiltration of the liver, and sigmoid diverticulosis.  Tr. at 473.

On December 30, 2008, Plaintiff underwent a CT of her chest which showed a stable nodule in her left lower lobe of the lung.  Tr. at 472, 520.

Medical records in the file show that Plaintiff was treating with Dr. Julie Bryan at Parkview Medical Group beginning at least in February of 2007 through 2012.  Tr. at 439-897.  Her treatment notes show that she treated Plaintiff for various conditions, including back pain, panic attacks, headaches, hypertension, chronic obstructive pulmonary disease, asthma, high cholesterol, a stroke on June 23, 2012.  *Id*.

On February 25, 2009, Dr. Bryan ordered sacrum and coccyx x-rays which showed no abnormalities.  Tr. at 596.

On March 22, 2009, Dr. Bryan wrote a letter indicating that Plaintiff had the medical problems of sleep apnea, severe hypertension that was very difficult to control, chronic disabling headaches, hypothyroidism, reflux, high cholesterol, asthma, history of nephritis years ago, PCOS/dysmetabolic syndrome, osteoarthritis, spinal stenosis, and Scheuermann disease.  Tr. at 582. Dr. Bryan indicated that Plaintiff was taking the following medications: Aldactone, Synthroid, Buspar, Oxycodone, Verapamil SR, Ambien CR, Hydralazine, Phenergan, Paxil, Ativan, MS Contin, MiraLax, Atenolol, Proventil and Serevent.  *Id*.  Dr. Bryan noted that Plaintiff smoked a pack and a half of cigarettes per day for several years, she had seen multiple doctors for her health problems, and she has been treated for her chronic back pain with narcotic medication because her pain was not surgically treatable.  *Id*.   Dr. Bryan indicated that Plaintiff's activities were quite limited from all of her health problems, but mostly due to her back pain and daily headaches.  Tr. at 582.  She further opined that Plaintiff's medications for her debilitating pains would make it impossible for her to drive or to function at a regular job and she would not be physically able to stand more than five minutes, could not lift, carry or handle objects for any length of time, she could sit for only up to half an hour,  her concentration was very limited, and she was not able to adapt to new situations. *Id*. Dr. Bryan further opined that no current findings suggested that Plaintiff would improve

-11-

significantly from her current level of functioning and she did not believe that Plaintiff would be able to return to work in the future.  *Id*. at 583.

On July 13, 2009, Plaintiff presented to the emergency room complaining of chest pain radiating to her left shoulder.  Tr. at 613.  Testing showed no cardiovascular problems and a chest x-ray was normal.  *Id.* at 613-621.

On July 27, 2009, a treatment note by Dr. Bryan indicated that Plaintiff presented with exacerbation of back pain.  Tr. at 590.  Plaintiff did not recall an event that precipitated the pain, but she did report that her dog escaped from her trailer and she had to chase after it to prevent it from going into the street.  *Id*. She reported trouble straightening her back and back pain with sneezing and coughing. *Id*.  Dr. Bryan listed Plaintiff's weight at 285 pounds, her blood pressure was 120/70, and her pain was in the lumbar area.  *Id*.  She diagnosed Plaintiff with lumbar back pain of uncertain etiology and noted consideration of a compression fracture due to Plaintiff's reported history of osteoporosis.  *Id.* Dr. Bryan continued Plaintiff on Morphine and Oxycodone and Plaintiff declined physical therapy and further imaging due to financial concerns.  *Id*.

On September 15, 2009, Plaintiff presented to the emergency room complaining of a headache.  Tr. at 627.  She was examined and treated for a diagnosis of cephalgia.  *Id*. at 627-630.

On May 9, 2010, Dr. Bryan ordered a chest x-ray and EKG after Plaintiff presented to the emergency room for complaints of chest pressure.  Tr. at 595.  The EKG was normal and the x-ray showed no active pulmonary disease.  *Id*. at 595, 654.  She was diagnosed with atypical chest pain and hypertension.  *Id*. at 659.

On June 5, 2010, Plaintiff presented to the emergency room complaining that she fell up the steps and hurt her wrist and back.  Tr. at 673-675.  She was diagnosed with right wrist contusion/sprain, sprain of the right little finger, abrasion to the right wrist, and low back pain.  *Id.* at 676-679.  X-rays of her lumbar spine showed early spondylosis and some vascular calcification without any aneurysm.  *Id*. at 679.

On October 13, 2010, Plaintiff presented to the emergency room complaining of pain in the left shoulder blade without shortness of breath.  Tr. at 692.  Plaintiff indicated that she had not taken her blood pressure medications for a couple of days as her prescription ran out.  *Id*.  A chest x-ray

-12-

was normal and Plaintiff was diagnosed with back pain and upper respiratory infection. *Id*. at 695.

On February 8, 2011, Plaintiff presented to the emergency room with complaints of headache with nausea over the last 2-3 hours. Tr. at 724. She was diagnosed with a migraine. *Id*. at 728.

On July 21, 2011, Dr. Onamusi, M.D., a consultative physician, evaluated Plaintiff at the request of the agency. Tr. at 755. He noted that Plaintiff had a history of severe uncontrolled hypertension with nephritis and chronic back pain. *Id*. He noted that after numerous hospitalizations for uncontrolled hypertension with nephritis, doctors were finally able to get her blood pressure under control with six medications, five of which she takes regularly and one that she takes when her systolic blood pressure goes above 160. *Id*. Dr. Onamusi also noted that Plaintiff reported headaches when her blood pressure rises and she had back pain with MRIs showing bulging disc and DDD at L1-L2. *Id.* He also noted Plaintiff's COPD history for which she uses an inhaler and medication. *Id*. Dr. Onamusi identified Plaintiff's medications as Atenolol, Hydralazine, Hytrin, Spironolactone, Synthroid, Lisinopril, Morphine Sulfate, Paxil, Amitriptylene, Lasix and Oxycodone. *Id.* at 756.

Upon physical examination, Dr. Onamusi indicated that Plaintiff weighed 282 pounds, she was 64 inches in height and her blood pressure was 118/84. Tr. at 756. He found no neck abnormalities upon examination, normal chest and heart examination, and no impaired memory, thought process, attention span, muscle power, reflexes and normal extremities. *Id.* at 756-757. He further noted that Plaintiff walked with a normal gait, she had no problems getting on and off of the examination table, she was reluctant to kneel or squat, she was unable to stand on her heels or toes, she was able to grip and grasp and could push and pull and perform fine coordination movements. *Id*. at 757. He reported that Plaintiff had a symmetric spine with no paraspinal muscle spasms, but she had moderate tenderness and negative straight leg raising. *Id*. He diagnosed hypertension with nephritis blood pressure currently controlled, history of COPD with seasonal symptoms, and chronic lower back pain probably degenerative in nature. *Id*. He opined that Plaintiff was capable of engaging in sedentary physical demand activities as defined in the Dictionary of Occupational Titles ("DOT"). *Id*.

-13-

On September 27, 2011, Plaintiff presented to the emergency room complaining of shortness of breath, cough, and post-nasal drip.  Tr. at 803-804.  She was diagnosed with exacerbated asthma and given medications.  *Id*. at 807.

On November 8, 2011, Plaintiff presented to the emergency room for a cough and mild back pain.  Tr. at 795.  She was diagnosed with COPD exacerbation and given medications.  *Id*. at 798.

On November 25, 2011, Plaintiff had a chest x-ray for her complaints of chest pain and cough and the x-rays showed no acute abnormality, although calcification of the transverse aorta was noted and moderate thoracic spondylosis.  Tr. at 764-765.  The emergency room doctor diagnosed anxiety and advised Plaintiff to stop smoking and he prescribed medication.  *Id*. at 777.

On June 24, 2012, Plaintiff presented to the hospital and was admitted.  Tr. at 823.  The treatment record indicates that Plaintiff initially presented to a local hospital the day before as Plaintiff was unable to speak except to say the word "was."  *Id*.  Plaintiff was assessed at that time with having a medication side effect/drug overdose and sent home but family brought her to the hospital the next day as her symptoms continued.  *Id*.  She was evaluated and admitted with diagnoses of a stroke affecting the right hand and causing significant aphasia, hypertension, high cholesterol, COPD, asthma, hypothyroidism and chronic smoker.  *Id*.  A MRI showed acute ischemia around the peripheral margins of the left parietal lobe consistent with left middle cerebral artery branch ischemia and no flow demonstrated in the left internal carotid artery at the skull base.  *Id*. at 834.  She was discharged from the hospital on June 28, 2012 and it was determined that no treatment would be effective, except to address the residual deficits with speech, physical and occupational therapy.  *Id*. Her medications were also reduced. *Id.*

On July 5, 2012, an agency reviewing physician reviewed Plaintiff's medical records and affirmed the assessment of Dr. Onamusi.  Tr. at 811.

### B.        Hearing testimony

At the hearing, Plaintiff, who was forty-nine years old, testified that she was married and lived with her husband and one of her adult sons.  Tr. at 913-914.  Plaintiff has a driver's license but does not drive because of the medications that she takes.  *Id*. at 914.  She was a LPN, but her

-14-

licensed expired in 2006.  *Id*.  Plaintiff reported that she can read and write, but she has trouble writing since her stroke.  *Id.* at 915.

Plaintiff described some of her past employment, explaining that she had trouble holding onto jobs because of her absences due to her back pain, fluctuating blood pressure, and severe headaches which began in 1999.   Tr. at 916.  She related that prior to her stroke in June of 2012, she could not work because of her severe back pain.  *Id*. at 917.  She also described her hypertension difficulties and her severe headaches emanating from her high blood pressure.  *Id*.

Plaintiff indicated that her medications made her sleepy, made her stomach hurt and caused constipation.  Tr. at 918.  She described a typical day at home prior to her stroke and indicated that she would wake up, watch television, and use the internet on her phone.  *Id*. at 919.  She explained that her husband performed all of the household chores and she had not done any household chores in years due to her back pain.  *Id*.

The ALJ then indicated that the medical record did not support the severity of Plaintiff's impairments back to the alleged onset date of 2005 as they did not reflect much change from the time that Plaintiff was working as a nurse to the time that she was not working.  Tr. at 919.  She related that she had no problem from the date of Plaintiff's stroke forward, but there were issues since the

 alleged onset date.  *Id*.  Counsel for Plaintiff then questioned her about her last year of work and Plaintiff indicated that she was missing work due to her back pain and headaches and she would sit in her car at lunchtime with her husband so that she could have back support.  *Id*. at 921.  She indicated that she continued to work even though she was having difficulty because her family needed the income.  *Id*.

The VE then testified.  Tr. at 924.  The ALJ presented a hypothetical individual to the VE of a person with Plaintiff's education, age and background, who could perform all of the functions of light work, except she needed a sit/stand option, occasional climbing of stairs, no climbing of ladders and the like, occasional stooping, kneeling and crouching, rarely crawling, occasional exposure to obvious hazards, work with a Specific Vocational Preparation level of 1 to 2, with pace and productivity not dictated by an external source over which the individual has no control, such

-15-

as an assembly line or conveyor belt.  *Id*. at 925-926.  The ALJ asked whether such a hypothetical individual could perform Plaintiff's past relevant work and the VE responded that such a person could not do so.  *Id*. at 926.  The ALJ asked whether such a hypothetical individual could perform other work existing in significant numbers in the economy and the ALJ responded that such a person could perform such jobs, including the representative occupations of production inspector, packer, and shipping weigher.  *Id.*

The ALJ then modified the hypothetical individual by attributing to her the only change of a sedentary work level, and the VE responded that such a person could perform other work existing in significant numbers in the economy, including the representative occupations of bench worker, assembler and order clerk.  Tr. at 926-927.  The VE also explained that the ordinary tolerance for employee breaks during the course of a workday was a fifteen-minute break in the morning and in the afternoon, a thirty-minute lunch period, and unscheduled breaks of one to two times per eight-hour shift of ten to fifteen minutes, although any time off task of more than 20% of the workday, including the breaks, would eliminate all employment.  *Id*. at 927.  The VE also testified that the ordinary tolerance for absenteeism was one to two days per month, unless a person was consistently absent, which would eliminate all employment.  *Id*.  He also testified that there would be no allowance for an employee laying down in the course of a workday.  *Id*.

Plaintiff's counsel then questioned the VE, with the VE responding that the sit/stand option usually allows alternating between the two once every fifteen minutes.  Tr. at 927.  When counsel added that the hypothetical person with the sit/stand option would also need to lean on something to balance or support her weight, the VE responded that the inability to use one of the upper extremities would rule out light and sedentary work because bimanual dexterity is required.  *Id*. at 928.  When counsel asked whether the pulmonary and/or postural restrictions affected the jobs identified by the VE, the VE responded that such jobs would not be eliminated.  *Id*.  Finally, counsel asked whether employers allowed employees to leave the factory area or break room to go to their cars and the VE responded that typically employers do not allow this to happen.  *Id*.

## VI.    LAW AND ANALYSIS

### A.    Treating Physician Opinion

Plaintiff first asserts that the ALJ erred in her analysis of treating physician Dr. Bryan's March 22, 2009 opinion.  ECF Dkt. #16 at 16-18.  She contends that Plaintiff's back pain and headaches were more than minimal as established by the medical evidence and Dr. Bryan's opinion was consistent with this medical evidence and therefore entitled to controlling weight.  *Id.* at 16.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.   A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007.  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013. The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  *Id.* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.  *Id.* citing §404.1527(c)(6).

Finally, an ALJ need not discuss every piece of evidence in the administrative record so long as she considers all of a claimant's medically determinable impairments and her opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir.2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir.2010) (quotation omitted).

A medical source's statement on an issue reserved for the Commissioner, such as an assertion that a claimant is "disabled" or "unable to work," is a legal conclusion and not a medical opinion. 20 C.F.R. § 416.927(e). Such statements are not entitled to any special significance. 20 C.F.R. § 416.927(e)(3). "The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir.2004).

Moreover, the "[r]esponsibility for deciding residual functional capacity rests with the ALJ," not a physician. *Vlach v. Comm'r of Soc. Sec.*, No. 12-2452, 2013 WL 3766585, at *12 (N.D. Ohio July 16, 2013) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)); accord 20 C.F.R. § 416.946(c) (the ALJ "is responsible for assessing your residual functional capacity"); *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide."). To determine an individual's RFC, the Commissioner will review "all of the relevant medical and other evidence" in the record, which may include, but is not limited to, medical source opinions. 20 C.F.R. § 416.945(a)(3).

Here, the ALJ gave little weight to the opinion of treating physician Dr. Bryan, first finding that her RFC and assertion that Plaintiff was unable to work are issues reserved to the Commissioner.  Tr. at 26.  The ALJ also found that the medical evidence prior to June 23, 2012 did not support Dr. Bryan's conclusions or stringent limitations.  *Id*. at 25-26.  The undersigned recommends that the Court find that the ALJ met the requirements of the treating physician rule and substantial evidence supports the ALJ's decision to attribute little weight to Dr. Bryan's opinion.

The ALJ correctly noted that opinions of treating physicians as to a claimant's ability to work and her RFC are issues reserved for the Commissioner and are never entitled to controlling weight. Tr. at 26, citing Tr. at SSR 96-5p.  Moreover, the ALJ cited to objective evidence prior to June 23, 2012 concerning Plaintiff's back impairment and headaches which showed that they were not as severely limiting as Dr. Bryan opined.  *Id*. at 26.  The ALJ referred to the medical evidence that she had discussed earlier in her decision, which included x-ray and MRI findings showing minimal to moderate degenerative changes in the thoracic spine and mild degenerative changes in

the lumbar spine, and Dr. Bojrab's diagnoses of DDD and radiculitis, for which he prescribed pain medications and administered injections that Plaintiff reported helped her pain.  *Id*. at 24, citing Tr. at 321-323, 325-330.  The ALJ also referred to Plaintiff's March 2006 complaints of back pain exacerbation and additional imaging studies showing multilevel DDD of the thoracic and lumbar spine, mild sacroiliac joint degenerative changes, and mild displacement of the coccygeal segments. *Id.* at 334-336.  She  cited to a June 15, 2006 MRI showing that Plaintiff had early lumbar spondylosis and a mild disc bulge at L4-L5 abutting the left L4 nerve root.  *Id*. at 333.  She further referred to June 2010 lumbar x-rays showing mild osteophytosis and early spondylosis and November 2011 x-rays showing moderate thoracic spondylosis.  *Id.* at 24, citing Tr. at 679, 765. The ALJ also noted the consultative examination findings of Dr. Onamusi on July 22, 2011, who found that Plaintiff had a normal gait, normal neurological findings and negative straight leg raising, and concluded that Plaintiff would be capable of sedentary work.  *Id*. at 26, citing Tr. at 757.

As to Plaintiff's headaches, the ALJ noted that Plaintiff's headaches were due to blood pressure fluctuations and migraines and some of the headaches required Plaintiff to seek emergency room assistance.  *Id*. at 26.  However, the ALJ cited to brain MRA results in 2003, 2005 and 2008 showing unremarkable results and a brain MRI in 2007 showing negative results.  Tr. at 24.  Based upon this evidence, the ALJ found that her RFC for Plaintiff adequately accommodated Plaintiff's headaches by restricting her lifting, postural movements and environmental exposures.  *Id*.

Based upon the record and a review of the ALJ's decision, the undersigned recommends that the Court find that the ALJ adequately stated her reasons for attributing less than controlling weight to Dr. Bryan's 2009 opinion and substantial evidence supports her decision to do so.

Plaintiff also mentions Dr. Bryan's opinion indicating that Plaintiff was unable to handle objects, citing to one instance in the record where Plaintiff complained of arm pain.  ECF Dkt. #16 at 16, citing Tr. at 329.  The ALJ addressed this part of Dr. Bryan's opinion as she determined that no evidence showed that Plaintiff could not fully use her hands and she cited to the report of agency consulting physician Dr. Onamusi, who examined Plaintiff on July 22, 2011 and found that Plaintiff had normal neurological findings and normal grip and handling abilities.  *Id*.  The undersigned recommends that the Court find that these reasons are adequate for not attributing controlling weight

-19-

to this part of Dr. Bryan's opinion and substantial evidence supports her determination. Moreover, Plaintiff points to no part of the record that establishes that she was unable to grip or handle objects.

## B.    Closed Period of Disability

Plaintiff also asserts that the ALJ erred when she failed to find that she was disabled for any twelve-month period of disability between March 31, 2005 and June 23, 2012 and failed to provide a sufficient explanation for finding that no twelve-month period existed within which Plaintiff was unable to sustain full-time work. ECF Dkt. #16 at 17-19. Besides asserting that the ALJ failed to adequately accord Dr. Bryan's opinion controlling weight, which the undersigned recommends that the Court find meritless as explained above, Plaintiff's only argument in support of this assertion is that Plaintiff's impairments combined to qualify her as disabled at least during one twelve-month period from March 31, 2005 through February 25, 2009. *Id*. She cites to her coccydynia, which was aggravated by her obesity, and her hypertension, hyperlipidemia, hypothyroidism, diabetes, lung problems, sleep problems, headaches and side effects from pain medications. *Id*. at 19.

As Defendant points out, the mere fact that Plaintiff identifies her impairments does not entitle her to a disability designation. *See Hill v. Comm'r of Soc. Sec.*, 56 Fed. App'x 547, 551 (6th Cir. Mar. 27, 2014), unpublished. Further, Plaintiff does assert any other errors committed by the ALJ in decision beyond the treating physician rule. Moreover, the entirety of the ALJ's decision addresses and supports her finding that Plaintiff was not entitled to a disability finding during the relevant time period. The ALJ addressed each and every one of Plaintiff's impairments, both individually and in combination. At Step Two of her analysis, the ALJ found that Plaintiff's spinal impairments, sacroiliac disease, hypertension, depression, anxiety, obesity and migraines to be severe impairments. Tr. at 18-19. At Step Three, the ALJ indicated that she found that Plaintiff's impairments, individually and in combination, did not meet or equal the Listings. *Id.* at 20. She discussed Plaintiff's tailbone condition, identifying March 27, 2006 x-rays showing mild displacement of coccygeal segments by a few millimeters, and subsequent x-rays from February 25, 2009 showing a normal sacrum and coccyx. *Id*. at 19. Despite these later normal findings, the ALJ nevertheless included a sit/stand option for Plaintiff in her RFC. *Id*. She also discussed Plaintiff's sleep problems, beginning with a July 2005 sleep study which showed obesity hypo-ventilation

syndrome with oxygen desaturation. *Id.* She noted that the use of continuous or bi-level positive airway pressure device was recommended, and Plaintiff testified that while she used this device, it did not help with daytime drowsiness. *Id*. However, the ALJ noted that the record failed to show that Plaintiff had the device re-titrated or that she told her doctors of its ineffectiveness. *Id*. She further found that the record failed to show that the impact of Plaintiff's sleep problems presented more than a minimal impact on her work-related limitations that were not accommodated by her RFC. *Id.* at 20. Nevertheless, the ALJ included limitations precluding exposure to obvious hazards, only occasional exposure to temperature extremes and respiratory irritants, and work precluding a pace of productivity over which Plaintiff has no control. *Id*. at 28. The ALJ also addressed Plaintiff's diagnoses and testimony regarding her high blood pressure, noting its long history and treatment with multiple medications. *Id*. at 23. She cited Plaintiff's thyroid disorder, kidney stones, high cholesterol, history of diverticulitus, reflux disease, dysmetabolic syndrome, non-insulin dependent diabetes, history of chest pain, shoulder blade pain, left knee pain and lung problems, as well as her sleepiness associated with her medications. *Id.* at 19-26. The ALJ found that these conditions did not result in more than minimal work-related limitations or did not show that they lasted for twelve months or more. *Id*. at 20. The ALJ also stated that she had considered the aggravating effects of Plaintiff's obesity in reaching her RFC and she had considered the side effects of her medications, including drowsiness. *Id.* at 24-26. The ALJ's RFC adequately accommodated Plaintiff's conditions.

In sum, the ALJ conducted a thorough review of the medical evidence and based upon the medical evidence, Plaintiff's testimony and the ALJ's decision, the undersigned recommends that the Court find that the ALJ adequately explained her reasoning for finding that Plaintiff did not have a disability during the relevant time period of March 31, 2005 through June 22, 2012 and substantial evidence supports her determination.

## VII.   RECOMMENDATION AND CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

DATE: May 20, 2015

                                             _____/s/George J. Limbert_____
                                             GEORGE J. LIMBERT
                                             UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).